SHEEHAN & ASSOCIATES, P.C.
Spencer Sheehan
60 Cutter Mill Road, Suite 409
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

JAMES CHUNG, ESQ.
43-22 216th Street
Bayside, NY 11361
Telephone: (718) 461-8808
Facsimile: (929) 381-1019
*jchung_77@msn.com*

United States District Court
Eastern District of New York                                    1:20-cv-03983

| | |
|---|---|
| DAVID CHUNG, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| - against – | Complaint |
| PURE FISHING INC., | |
| Defendant | |

## **INTRODUCTION**

      Plaintiff DAVID CHUNG ("Plaintiff" herein), individually and on behalf of all similarly situated, bring this Class Action Complaint against PURE FISHING INC. ("Pure Fishing" or "Defendant" herein), and on the basis of personal knowledge, information and belief, and investigation of counsels, allege as follows:

## **NATURE OF THE ACTION**

1.      An old adage states that "a bad day at fishing beats a good day at the office,"

however, using one of Defendant's product can be very frustrating.

2.      This is a consumer class action on behalf of consumers seeking remedy for Defendant's deceptive business practice in manufacturing, marketing and selling artificial imitation fishing baits (herein "imitation bait," "replicator" or "the gulp") with defective packaging.

3.      Pure Fishing Inc. (herein "Defendant") is one of the world's largest makers of fishing tackle.   It manufactures about 30,000 different types of bait, fishing lures, rods, reels and lines.   It also manufactures the product at issue: Berkley Gulp! (herein "the product" or "Gulp").

4.      According to Defendant's website, it manufactures and sells 194 different baitfish replicators under the Gulp! brand.   The replicators consist of different combination of fish bait imitations, colors, and sizes, floating inside a liquid formula.

5.      Defendant's Gulp! is sold to consumers throughout the United States through various large retailers, and tackle shop including Dick's Sporting Goods, the Bass Pro Shop and Walmart.   The items are also sold at various e-commerce websites such as Amazon.com and eBay.

6.      Defendant sells the product in various containers.   The defective containers at issue are the re-sealable packet and the pint-sized tub container.

7.      On the re-sealable packet, the potent chemical substance permeates through the seal top causing loss of expensive liquid.

8.      On the tub container, the highly touted formula dissipates through the lid which can cause a majority of the liquid to leak.

9.      Indeed, Counsel's pre-litigation experiment indicates defective packaging on both the re-sealable packet and the tub container.

10.      The defective packaging deceives and damages consumers who typically pay approximately $6.99 - $9.99 for the re-sealable packet and $19.99 - $24.99 for the tub container.

11.      The defective packaging at issue can be easily remedied by utilizing different material or improving quality control.   Similar containers used by companies in different industries are more efficient and do not leak.

12.      As early as 2010, numerous consumers have complained directly to Defendant about the defective leaky packaging and resorted to self-repair.   As a matter of fact, complaints has appeared online regarding the leaky containers since 2010 continuing until end of 2019.

13.      Nevertheless, Defendant continues to sell the defective products without redressing the problem in order to generate greater sales and revenue.   This also results in increased profit for Defendant as consumers are induced to purchase more of its product.

14.      The consumers are deprived of the full value of the product they have purchased.

15.      In addition, Defendant profits from the sales of product that the reasonable consumer cannot fully use and is unjustly enriched.

16.      The reasonable consumers are misled, deceived, and defrauded by the product that Defendant markets and sells.

17.      Had Plaintiff known of the deceptive defective packaging, Plaintiff would not have purchased Defendant's product or would not have paid the premium price demanded by Defendant.

18.      Plaintiff asserts putative class action on behalf of himself and all other consumers who purchased Defendant's product.   They seek damages, restitution and injunctive relief.

## JURISDICTION AND VENUE

19.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

3

§ 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA"). The aggregate claims of all members of the proposed class and subclasses are in excess of $ 5 million, exclusive of interest and costs, and there are more than 100 putative class members, Plaintiff, as well as members of the proposed class, are citizens of a state different from Defendant.

20.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omission, and acts giving rise to the claim occurred in this District where Defendant distributed, marketed, advertised, and sold the various Berkley Gulp! products at issue throughout New York.

21.     Pursuant to 28 U.S.C. § 1391(b)(2), this Court is the proper venue because Plaintiff Chung and a substantial portion of putative class members are residents of this District and a substantial part of the acts and omissions that gave rise to this Complaint occurred or emanated from this District.

22.     This Court has personal jurisdiction over Defendant because it is authorized to do business and does business in New York, has marketed, advertised and made sales in New York, and has sufficient minimum contacts with this state and/or sufficiently avails itself of the markets of this state through its promotion, sales, and marketing within this state to render the exercise of jurisdiction by this Court permissible.

## FACTUAL ALLEGATIONS

23.     The history of Berkley imitation scented bait goes back to 1985 when it released the "Strike." [1]   It was followed by a "PowerBait," and eventually Gulp! was released in 2003.

24.     Defendant makes the following claims in regards to the product's efficacy:

---

[1] *Leakproof Gulp Container*, Striperonline.com, July 2010, Talk forum available at https://www.stripersonline.com/surftalk/topic/378814-leakproof-gulp-container/

- Outfishes All Other Bait, 400x More Scent Dispersion
- Expands a fish's strike zone by up to 400x,
- Gulp! Imitates the natural odor and flavor of live bait,
- CATCH MORE FISH!

25.     The replicators (imitation fish) and the potent liquid formula (fish attractant liquid) are packaged together in a container to be utilized for fishing.

26.     Gulp! is sold in variety of packages. Two types of containers - a jar/tub lid container and a smaller sized re-sealable plastic packet are currently at issue.

27.     The smaller res-sealable packet retails for $ 6.99 to $ 9.99, excluding tax.    The larger tub container retails for $ 19.99 to $ 24.99, excluding tax.



Pint Sized Tub



Re-Sealable Packet/Plastic Container

5

28.     Many fishermen purchase multiple kinds of Gulp because the fish will be lured to different color and size bait depending on the tide, weather condition and the type of bait fish in the water.

29.     The highly touted liquid formula dissipates from the re-sealable packet soon after opening.   The packet will leak in any position and whether the packet is tightly closed or not. Some improvements seem to have been made on the 2020 released product, regardless, the packet continues to leak.

30.     The tub container only leaks when it is not placed in an upright position.    It leaks when the tub is placed on a tilted angle or upside down.

31.     Defendant has known about the problem with the defective leaky containers for many years.   Numerous complaints have been lodged with Defendant dating back at least as far as ten years ago.

32.     In fact, in *On the Water,* a popular local fishing website, a product managers acknowledged the problem with the defective container.   He stated "Berkley became aware of the leakage issues with the old jars so we put forth an effort to eliminate the problem."   He continued, "On the old container, the seals became 'hindered' and wouldn't seal perfectly.   Now, after lab testing, there is tremendous improvement."[2]

33.     Improvement or not, the problem persists and there are older defective containers floating around in the market.

34.     Below is a mere sampling of online consumer complaints compiled from various websites popular to fishermen.

---

[2]   Captain Scott Newhall, *Synthetic Bait Storage Solutions*, On the Water, July 2018. https://www.onthewater.com/synthetic-bait-storage-solutions

35.     On a fishing website striperonline.com, one poster questions: "Has anyone found a good solution to Gulp!'s leaky container?   I am looking for a leak proof solution.   The storage container leaks around the tip."

36.     Some comments that followed include; "I work for the world's largest cosmetics company – we'd be out of business if we sold stuff that leaked like Gulp does after opening. Shame on them." "I had the same problem had the gulp stored in my basement in the offseason the bag it was in fell over.   The goo leaked everywhere when I found it after a couple of months the gulps were hardening and the goo was all over everything."

37.     The leaky container problem continued to 2013 where a Youtube video garnered more than 4,300 views.[3]

38.     And continued to 2015 where another Youtube video with the same complaint garnered more than 98,000 views.[4]

39.     And continued to August 2018, where the video garnered more than 92,000 views.[5]

40.     The problem continued to November 2019 where the Youtube video had over 30,000 views.   The Youtuber speculated that the "gulp was engineered to leak out of its package."[6]

---

[3]  *Liquid Bait No Leak Container*, August 2013.
   Video available at - https://www.youtube.com/watch?v=0G5WMSJbfiU

[4]  How to Maintain Berkley Gulp Bait, April 2015. Available at https://www.youtube.com/watch?v=7-FXdmoi7j8, 1:00 comments at minute mark.

[5]  Berkley Gulp Tips to SAVE MONEY and CATCH MORE FISH – August 2018, available at https://www.youtube.com/watch?v=4CB1zSTUHFg comments at 2:40 minute mark.

[6]  How to Maintain Berkley Gulp Bait, April 2015. Available at https://www.youtube.com/watch?v=7-FXdmoi7j8, 1:00 comments at minute mark.

41. The video was followed by comments such as:

**John Jaeger** 2 years ago

I am getting damn tired of these stinking gulp juice in my tackle box and bags . It seems a company is more set on sales than keeping a good customer relations. These bait containers leak all over in my box and bag ,even when stored flat ruining my tackle bag and a lot of tackle . In the tackle box several buck tails and Redfish lures destroyed . This stuff should be labeled CORROSIVES . I am very disappointed for the price you people cannot do any better

**Ken Martin** 2 years ago

Simple and easy solution, costs $10. $5 for one of those half gallon thermos jugs, $5 for a bottle of Gulp recharge to top off the juice. If you don't see the color gulp you want, tighten the lid and shake the jug. You can beat the heck out of it in the boat, and it won't split or leak like those plastic containers you have in the pic.

**Anonymous** 🕐 1 year ago

I don't have an issue with the cost, the smell, or how soft they are. I do have an issue with the packaging that always leaks out and how the gulp baits them selves self destruct by drying out so quickly (with no way to bring them back)! it's spoiled acouple of fishing trips for me, so as a consequence I look for "other" baits. Better to have gone fishing and not catch any then go and end up with no "usable" bait and not fish at all.

42. The fishermen found various remedies to the leaky container issue because Defendant did not rectify the problem.

43. The fix included various methods such as "taking them out of the tub and put a few in the plastic bag to carry," to "I use the Thermos," and most popular by far "purchasing a water-proof stowaway."

44. As a matter of fact, almost all serious fishermen on a party boat utilizes a safer, non-leaking container, not Defendant's original container.

45. Meanwhile, Defendant's product engineers seem to have "Gone Fishing." Eventually, they came up with an ingenious solution: Berkeley Gulp Alive Recharge!

46. The recharge liquid is "meant to refill the gulp container with Berkley's potent Gulp." Instead of addressing the problem head on and fixing the leaky container problem, Defendant produced a product that will remedy the problem at the consumers' expense.

47. Needless to say, the refill sales will make additional income for Defendant.

Under the circumstances Defendant has no desire to remedy the problem because it would be adverse to their interest.

48.     The liquid currently sells for $5 to $7 for an eight-ounce bottle at retailer stores.

49.     Counsel's pre-litigation investigation confirmed Defendant's defective packaging.

50.     A side-by-side experiment was conducted with Defendant's re-sealable packet and a Ziploc re-sealable sandwich bag.    The gulp re-sealable packet was purchased in June 2020. The Ziploc sandwich bag retails for $ 3.50 for 150 count, a little more than 2 cents each.    The bags were laid flat on a dry plate with water in them.

51.     The Ziploc sandwich bag resulted in no leak and no liquid lost after a 24-hour period.    To the contrary, Defendant's re-sealable packet showed a noticeable leak after one hour resulting in a small puddle.    After twenty-four hours, the puddle was visibly larger.    The liquid loss is estimated to be about 75 %.

52.     The gulp tub container did not fare any better on a side-by-side experiment with an inexpensive peeled garlic container.    The gulp tub container was purchased on or about June 2019.    The tightness of the lids was confirmed.    Both containers were placed at a right angle (90 degree) with part of the lid touching the surface.    In the first experiment, the garlic container and the gulp container had no loss of fluid after one hour.

53.     A second experiment was conducted with the same conditions except the two containers were rotated 90 degrees.    The containers' lid still touched the surface.    The inexpensive garlic container did not have any visible leak.    On the contrary, the gulp container showed a small puddle.    After three hours, the surface of the plate was filled with puddles of water.

9

54.     The result of the experiment indicates that either part of lid or part of the rim is defective.

55.     An observation of the inner lining of the gulp container lid indicates that Defendant's lid contains two layers of lining while the inner lining for the garlic container has three layers of inner lining.   The additional lining may have prevented water from leaking out of the garlic container.

56.     The cap size of the containers is almost identical meaning that the size of the container does not always determine the size of the cap.   Therefore, the number of inner lining is adjustable according to preference.

57.     The experiment indicates that Defendant's defective packaging is easily curable utilizing a cheap replacement container or a minor adjustment of the parts.

58.     The experiment provides credence to the Youtuber's comment that the container was "intentionally designed to leak." Defendant will be able to sell more of its products if consumers waste more through leakage.

59.     Defendant's defective packaging causes fishermen to lose a significant amount of valuable Gulp! liquid formula; the substance that was touted by Defendant to have 400x more scent dispersion, expand strike zone by 400x and results in more fish.

60.     The loss of liquid formula not only causes the replicator to loss potency to attract fish, but it will cause the replicator to harden, making it useless.

61.     The resulting harm to consumers is loss of money, loss of time, cause of frustration and annoyance.

62.     Money is lost when the consumers are forced to purchase a replacement Gulp!, the recharge liquid formula or a new waterproof container.

63.     The consumers lose time to clean up the mess that was created or to go to the store to pick up a replacement or a waterproof container.

64.     The frustration and annoyance is caused by the reasons stated above and when he arrives at the fishing boat only to find out that the leakage depleted his baits.

65.     The consumers are deceived into purchasing a defective product known to Defendant.

66.     Defendant's defective packaging and its misrepresentation and omissions give rise to Plaintiff's consumer deceptive business practice and warranty claims.

67.     Defendant fails to disclose that the packaging is defective for the intended purpose and the consumers will not be able to use a large portion of the liquid formula.

68.     The consumers are hindered from utilizing a large portion of the potent liquid formula.

69.     Aside from the leakage, the product can be imminently dangerous.    The product is very slippery due to its lubricity.    As a matter of fact, Plaintiff in this case witnessed two people slip and fall on the substance while fishing on a boat.

70.     Nevertheless, Defendant continues to sell the product in the defective container. Defendant's misconduct and omission deprives consumers the full value of the purchase price.

71.     Defendant's acts and omissions results in greater sales and increased profit to Defendant since consumers must purchase the product more frequently.

72.     Had Plaintiff known of Defendant's acts and omission, he would not have purchased the product, paid less for the product, or acted in a different manner.

## PARTIES

73.     Plaintiff David Chung is a citizen of New York State and resides in Richmond

County, Staten Island, New York.

74.     Plaintiff has been an avid fisherman for more than twenty years.    Plaintiff enjoys fishing once or twice a week from early April to October, utilizing Defendant's product.

75.     Plaintiff was introduced to Defendant's product in 2015 and immediately found it to be highly effective.

76.     Plaintiff started spending less than $ 100 annually to eventually more than $150 annually by 2020 on Defendant's Gulp! product.    The price for the re-sealable packet ranged from $4.99 to $9.99 and the tub container ranged from $12.99 to $23.99.    The wide price range is due to price increase over the years and the stores charge different price for various color and sizes.

77.     Plaintiff Chung soon discovered that the product's effectiveness was masked by some flaws.

78.     The flaws included tails easily falling off from small baitfish bites, the expensive price and the foul odor emanating from the product.    Plaintiff understood that the lack of durability, the high price and the foul odor was beyond Defendant's control.

79.     However, the leaky container is within Defendant's control and easily remediable.

80.     Plaintiff experienced leaks in the container, on both re-sealable packet and the tub container since he first bought the Products.

81.     Plaintiff experienced many failed moments with the defective packaging.

82.     On one occasion, Plaintiff stored the product in the basement shelf.    One of the family members knocked over the container causing leaks which Plaintiff found out weeks later.

83.     On another occasion, Plaintiff arrived at the fishing destination after a long drive to find the gulp liquid formula spilled all over the trunk.    It had stained the carpet and a shirt.

84.     Next, Plaintiff found a puddle of gulp liquid by the container while fishing on a

charter boat with his friends.    On a closer look, he noticed the container leaking from the bottom. Plaintiff could not see any crack but the liquid was slowly dripping.

85.     Still on another occasion, a friend opened the tub to use the gulp and did not close the lid tightly (if that was possible).    The liquid content spilled all over the boat by the time Plaintiff noticed.

86.     Yet on another occasion, Plaintiff Chung found his tackle ruined from the leaked gulp that had been stored inside the fishing bag.

87.     Many more minor episodes occurred culminating in Plaintiff having to clean up the mess, endure the foul odor and purchase additional gulp products at his expense.

88.     Plaintiff does not believe the leakage is due to his carelessness.    Plaintiff has inspected the cap and made sure to confirm and confirm again the tightness of the lid.

89.     By 2019, Plaintiff individually wrapped two tub containers in a plastic wrap and three re-sealable packet in a Ziploc sandwich bag.    Plaintiff carried different colors and different sized gulp to fishing.

90.     This also became burdensome since the gulp container leaked inside the wrap. Although, the plastic wrap prevented total waste of the liquid, a noticeable amount was lost to leakage.

91.     In 2020, Plaintiff decided to purchase a waterproof container and put all different sizes and colors in it.

92.     Plaintiff observed a noticeable drop off of fish bites after all the gulps were combined into one container.    The fish bite on different gulp product since each gulp color represents different baitfish and odor.

93.     Plaintiff continues to combine different size and color into one waterproof

container to avoid leaks from Defendant's defective container.

94.     Plaintiff has not purchased Defendant's product since August 2020.

95.     Plaintiff intends to, seeks to, and will purchase the Products again when he can do so with the assurance that Products will no longer have the defects and faults identified herein

96.     Defendant is an Iowa corporation with a principal place of business in Richland County, Columbia, South Carolina.

## CLASS ACTION ALLEGATIONS

97.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3) ("the Class").

98.     The proposed class consists of: All persons who purchased one or more Gulp! replicator products in the United States and its territories or possessions sold by Defendant.[7]

99.     Plaintiff also brings this suit on behalf of sub-classes consisting of purchasers of the products in New York during the proposed class period.

100.     The members of the class are so numerous that joinder is impracticable.

101.     Plaintiff's claims are typical of the claims of the entire class because Plaintiff purchased a defective Berkley Gulp! product.

102.     Plaintiff will fairly and adequately represent and protect the interests of the other class members for purposes of Federal Rule of Civil Procedure 23(a)(4).

103.     Plaintiff has no interests antagonistic to those of other class members.

104.     Plaintiff is committed to the vigorous prosecution of this action and has retained counsel experienced in class action litigation.

---

[7] The "Class Period" for each claim is provisionally intended to be the respective statute of limitations for each claim, with Plaintiff reserving the right to invoke the equitable tolling doctrine based on the discovery rule or other basis as discovery and the case progresses.

105.     Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact exist as to all members of the class and predominate over any questions affecting only individual members of the class, including, but not limited to:

106.     Whether Defendant's packaging is defective;

a.     How long the Defendant has known the Berkley Gulp! is defective;

b.     Whether the defects in the product constitute material facts that reasonable purchasers would have considered in deciding whether to purchase them;

c.     Whether the Defendant's product possess material defects;

d.     Whether Defendant knew or should have known of the inherent defect when they placed them in the stream of commerce;

e.     Whether Defendant concealed the defects from consumers;

f.     Whether the Berkley Gulp! replicators including packaging are merchantable;

g.     Whether the products are fit for their intended use;

h.     Whether any accessories or attachments purchased with the products are useless;

i.     Whether Defendant was unjustly enriched by the sale of the defective product;

j.     Whether any false warranties, misrepresentations and material omissions by Defendant concerning their product caused class members financial damages; and

k.     Whether Defendant should be enjoined from further sales of the defective products.

107.     Class certification under Federal Rule of Civil Procedure 23(b)(3) is superior to other available methods for the fair and efficient adjudication of this controversy.

108.     Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members

to seek redress for the wrongful conduct alleged.

109.    Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

110.    Class members have suffered and will suffer irreparable harm and damages as a result of Defendant's wrongful conduct.

## CLAIMS FOR RELIEF
## COUNT I
## BREACH OF EXPRESS WARRANTY

111.    Plaintiff incorporates by reference all preceding paragraphs.

112.    Defendant is, and at all times relevant was, a merchant and sold goods to Plaintiff.

113.    Defendant made an affirmation of fact and promise about the quality of the goods and made the following warranty statement:

> Berkley warrants to the original purchaser that its Berkley products are free from defects in materials or workmanship for a period of one (1) year from the date of purchase. Berkley is not responsible for normal wear and tear, for products used commercially or for failures caused by accidents, abuse, alteration, modification, misuse or improper care.

114.    Defendant expressly warranted that the product at issue was:

a. in good quality;

b. generally fit for its intended purpose;

c. merchantable; and

d. free from defect.

115.    Plaintiff relied upon Defendant's expressed warranties regarding its specialized knowledge, expertise, experience, skills, and judgment to properly perform its duties in a manner that would not present an unreasonable risk of harm or place an undue burden upon Plaintiff.

16

116.     By selling the defective product containing those defects to consumers like Plaintiff and class members after it gained knowledge of the defects, Defendant breached its expressed warranty to provide goods that were free from defects.

117.     The product, as sold, did not conform to the express warranties.

118.     As set forth above, Defendant had knowledge of the defects alleged herein.

119.     At the time Defendant warranted and sold the defective goods, it knew that the defective goods did not conform to the warranties and were inherently defective, and Defendant wrongfully and fraudulently misrepresented and concealed materials facts regarding its goods.

120.     Defendant knew that its goods were susceptible to malfunction but failed to provide defect-free goods to Plaintiff or class members, or to timely provide an adequate remedy to the defective packaging material.

121.      Defendant was provided with notice, and has been on notice, of the defects and of its breach of express written warranties through hundreds or thousands of consumer warranty claims reporting malfunctions and customer complaints.

122.      Yet, Defendant failed to repair the defective packaging to ensure they were free of material defects or component malfunctions as Defendant promised.

123.     As a direct and proximate result of Defendant's breach of its express warranties, Plaintiffs suffered damages in an amount to be determined at trial.

**COUNT II**
**Breaches of Express Warranty, Implied Warranty of Merchantability and**
**Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.**

124.     Plaintiff incorporates by reference all preceding paragraphs.

125.      Defendant is, and at all times relevant was, a merchant and sold goods to Plaintiff.

126.    The goods sold to Plaintiff were not merchantable at the time of the sale, as said goods were defective due to the defective packaging.

127.    The defects were present at the point of sale which rendered the product defective.

128.    At all times relevant hereto Defendant was under a duty imposed by law requiring that a manufacturer's and merchant's product be reasonably fit for the ordinary purposes for which the product is used, and that the product be acceptable in trade for the product description.

129.    This implied warranty of merchantability is part of the basis for the bargain between Defendant on the one hand, and Plaintiff and class members on the other.

130.    Notwithstanding the aforementioned duty, at the time of delivery, Defendant breached the implied warranty of merchantability in that the goods were defective, would not pass without objection, are not fit for the ordinary purposes for which such goods are used, and failed to conform to the standard performance of like products used in the trade.

131.    Defendant knew or should have known that the goods are defective and knew or should have known that selling the defective goods to Plaintiff and class members constituted a breach of the implied warranty of merchantability.

132.    Plaintiff relied upon Defendant's specialized knowledge, expertise, experience, skills, and judgment to properly perform its duties in a manner that would not present an unreasonable risk of harm or place an undue burden upon Plaintiff.

133.    As a direct and proximate result of Defendant' breach of the implied warranty of merchantability, Plaintiff and class members bought the defective products without knowledge of their defects.

134.     As a direct and proximate result of Defendant' breach of the implied warranty of merchantability, Plaintiff and class members purchased defective products which could not be used for their intended purpose.

135.     Defendant received notice and should have been aware of these defect packaging due to numerous complaints by consumers to its main office over the past several years.

136.     As a direct and proximate result of Defendant's breach of its implied warranty of merchantability, Plaintiffs suffered damages in an amount to be determined at trial.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE:    Violations of Magnuson-Moss Act (15 U.S.C. §§ 2301-2312)

137.     Plaintiff incorporates by reference all preceding paragraphs.

138.     Defendant is, and at all times relevant was, a merchant and sold goods to Plaintiff.

139.     Plaintiff and class members are "consumers," as that term is defined by 15 U.S.C. § 2301(3).

140.     Defendant is a "warrantor" and supplier," as those terms are defined by 15 U.S.C. § 2301(4) and (5).

141.     Defendant provided Plaintiff and class members with "implied warranties," as that term is defined by 15 U.S.C. § 2301(7).

142.     By Defendant's conduct as described herein, including Defendant's knowledge of the defects contained within the defective packaging and their action, and inaction, in the face of that knowledge, Defendant has failed to comply with their obligations.

143.     Prior to the sale, Defendant had reason to know the particular purpose for which Plaintiff bought the goods, the above-mentioned product.

144.     Defendant had reason to know Plaintiff was relying on Defendant's skill, knowledge, expertise, experience, and judgment to select goods suitable for the particular purpose for which Plaintiff bought the goods.

145.     Plaintiff relied on Defendant to select the appropriate packaging material.

146.     The goods were not suitable for the particular purpose for which Plaintiff bought the goods.

147.     As a result of Defendant's breach of implied warranties, Plaintiff and class members are entitled obtain damages and equitable relief, and obtain attorney's fees and costs pursuant to 15 U.S.C. § 2310.

## COUNT IV
## FRAUD

148.     Plaintiff incorporates by reference all preceding paragraphs.

149.     Defendant's fraudulent intent is evinced by knowingly distributing the Products into the market with awareness of the issues described herein.

150.     Plaintiff and class members would not have purchased the product or paid as much if the true facts had been known, suffering damages.

## COUNT V
## NEGLIGENT MISREPRESENTATION

151.     Plaintiff hereby incorporate by reference the allegations contained herein.

152.     Defendant negligent and recklessly omitted certain material facts regarding the defective packaging in its Berkley Gulp! product.

153.     Defendant failed to warn consumers that the pump dispensers would likely fail, causing a material amount of the product to be dissipated and lost.

20

154.     Under the circumstances alleged, Defendant owed a duty to Plaintiffs and Class members to provide them with a non-defective packaging material that would allow them to access the product they bargained for.

155.     Defendant misrepresented to Plaintiffs and Class members that by purchasing the product, they would be enjoying the full amount of listed product. This is not what Plaintiffs or Class members actually received.   Defendant failed to inform consumers of the defective packaging.

156.     Defendant's misrepresentations and omissions, as described herein, were false, negligent, and material.

157.     The information misrepresented to Plaintiffs and other Class members is material and would have been considered by a reasonable person.

158.     Defendant negligently made these misrepresentations and omissions with the understanding that Plaintiffs and Class members would rely upon them.

159.     Plaintiffs and Class members did, in fact, reasonably rely upon these misrepresentations and omissions made by Defendant.

160.     As a direct and proximate result of Defendant's negligent actions, Plaintiffs and Class members have suffered injury in fact and/or actual damages in an amount to be determined at trial.

## COUNT VI

## UNJUST ENRICHMENT (Quasi-Contract)

161.     Plaintiff incorporates by reference all preceding paragraphs.

162.     Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

163.     Defendant received proceeds from their sale of the defective goods, which were purchased by Plaintiff and class members for an amount far greater than the reasonable value because of defective packaging.

164.     In exchange for the purchase price paid by Plaintiff and class members, Defendant provided the defective goods that are likely to fail within their useful lives.

165.     Plaintiff and class members reasonably believed that the Defendant's goods would function as advertised and warranted, and did not now, nor could have known, that the defective packaging contained latent defects at the time of purchase.

166.     Defendant knows of and appreciates the benefit conferred by Plaintiff and class members and has retained that benefit notwithstanding their knowledge that the benefit is unjust.

167.     It is against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from Plaintiffs and the class members given that products were not what Defendant purported them to be.

168.     It would be unjust and inequitable for Defendant to retain the benefit, warranting disgorgement to Plaintiffs and the class members of all monies paid for the products, and/or all monies paid for which Plaintiffs and class members did not receive benefit.

## COUNT VII

## VIOLATION OF NEW YORK GENERAL BUSINESS LAW ("GBL"), §§ 349 & 350 AND STATE CONSUMER PROTECTION LAWS

169.     Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

170.     Defendant's deceptive trade practices in, inter alia, misrepresenting the quality and character of the defective goods, and selling the defective goods knowing same to be defective,

violate the following state consumer statutes:

      a.    The Alabama Deceptive Trade Practices Act, Ala. Code §§ 8-19-5(2), (3), (5), (7) and 27), et seq.;

      b.   The Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. §§ 45.50.471-45.50.561;

      c.   The Arizona Consumer Fraud Act, A.R.S. §§ 44-1522;

      d.   The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-107(a)(1)(10) and 4-88-108(1)(2), et seq.;

      e.   The California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq.; and the California Unfair Competition Law, Cal. Bus. And Prof. Code, § 17200, et seq.;

      f.   The Colorado Consumer Protection Act, Col. Rev. Stat. Ann. §§ 6-1- 105(1)(b), (c), (e) and (g), et seq.;

      g.   The Connecticut Unfair Trade Practices Act, Conn. Gen, Stat. § 42-110(b), et seq.;

      h.   The Delaware Consumer Fraud Act, Del. Code. Ann. Title 6 § 2513, et seq.;

      i.   The District of Columbia Consumer Protection Act, D.C. Code §§ 28-3904(a), (d), (e), (f) and (r), et seq.;

      j.   The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204(1), et seq.;

      k.   The Georgia Fair Business Practices Act, Ga. Code Ann. §§ 10-1-393(a) and (b)(2), (3), (5) and (7), et seq.;

      l.   The Hawaii Deceptive Trade Practices Act, Haw. Rev. Stat. Ann. §§ 481A3(a)(5), (7) and (12), et seq., and the Hawaii Consumer Protection Act, Haw. Rev. Stat. Ann. §§ 480-2(a), et seq.;

m.  The Idaho Consumer Protection Act, Idaho Code §§ 48-603(5), (7), (17) and (18), et seq.;

n.  The Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 Ill, Stat. § 505/2, et seq., and the Illinois Uniform Deceptive Trades Practices Act, 815 Ill. Stat. §§ 510/2(a)(5), (7) and (12), et seq.;

o.  The Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-3(a) and (b)(1) and (2), et seq.;

p.  The Iowa Consumer Fraud Act, I.C.A. §§ 714H.3 and 714H.5, et seq.;

q.  The Kansas Consumer Protection Act, Kan, Stat. §§ 367.170(1) and (2), et seq.;

r.  The Kentucky Consumer Protection Act, Ky. Rev. Stat. §§ 367.170(1) and (2), et seq.;

s.  The Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1405(A), et seq.;

t.  The Main Uniform Deceptive Trade Practices Act, 10 M.R.S.A. §§ 1212(1)(E) and (G), et seq., and the Main Unfair Trade Practices Act, 5 M.R.S.A. § 207, et seq.

u.  The Massachusetts Consumer Protection Act, Ma. Gen. Laws Ann. Ch. 93A § 2(a), et seq.;

v.  The Maryland Consumer Protection Act, Md. Code Commercial Law, §§ 13-301(1) and (2)(i)-(ii) and (iv), (5)(i) and (9)(i), et seq.;

w.  The Michigan Consumer Protection Act, M.C.P.L.A. §§ 445.903(1)(c), (e), (s) and (cc), et seq.

x.  The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(5), (7) and (13), et seq., and the Minnesota Consumer Fraud Act, Minn.

24

Stat. § 325F.69, subd. 1, and Minn. Stat. § 8.31, subd., et seq.

y.  The Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-5(1), (2)(b), (c), (e) and (g), et seq.

z.  The Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020(1), et seq.

aa. The Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. § 30-14—103, et seq.

bb. The Nebraska Consumer Protection Act, Neb. Rev. Stat. § 591602, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87- 302(a)(5) and (7), et seq.

cc. The Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598.0915(5) and (7), et seq.

dd. The New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358- A:2(v) and (vii), et seq.

ee. The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, et seq.

ff. The New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-2(D)(5), (7) and (14) and 57-12-3, et seq.;

gg. The New York Business Law, N.Y. Gen. Bus. Law § 349(a);

hh. The North Carolina Unfair Trade Practices Act, N.C.G.S.A. § 75-1.1(a), et seq.;

ii.  The North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code § 51-15-02, et seq.;

jj.  The Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.02(A) and (B)(1) and (2), et seq.;

kk. The Oklahoma Consumer Protection Act, 15 O.S. §§ 753(5), (7) and (20), et seq.;

25

ll.  The Oregon Unfair Trade Practices Act, Or. Rev. Stat. §§ 646.608(1)(e), (g) and (u), et seq.;

mm.  The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-2(4)(v), (vii) and (xxi), and 201-3, et seq.;

nn.  The Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws §§ 6-13.1-1(6)(v), (vii), (xii), (xiii) and (xiv), et seq.;

oo.  The South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5.20(a), et seq.;

pp.  The South Dakota Deceptive Trade Practices Act and Consumer Protection Act, S.D. Codified Laws § 37-24-6(1), et seq.;

qq.  The Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-104(a), (b)(2), (3), (5) and (7), et seq.;

rr.  The Texas Deceptive Trade Practices Consumer Protection Act, V.T.C.A. Bus. & C §§ 17.46(a), (b)(5) and (7), et seq.;

ss.  The Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-4(1), (2)(a), (b) and (i), et seq.;

tt.  The Vermont Consumer Fraud Act, 9 V.S.A. § 2453(a), et seq.;

uu.  The Virgin Islands Consumer Protection Law, V.I. Code Ann. tit. 12A, § 101, et seq.;

vv.  The Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-200(A)(5), (6) and (14), et seq.;

ww.  The Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, et seq.;

xx.  The West Virginia Consumer Credit and Protection Act, W.V.A. Code § 46A6-

104, et seq.; and

yy. The Wyoming Consumer Protection Act, Wyo. Stat. Ann. §§ 40-12-105(a), (i), (iii) and (xv), et seq.

144.    By this cause of action, Plaintiff pleads on behalf of the class violations of all the foregoing consumer and deceptive trade practice laws.

**JURY DEMAND**

Plaintiff hereby demand a trial by jury on all claims so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all members of the Class, pray for judgment as follows:

A.  Certifying the proposed Class as requested herein;

B.  Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

C.  Declaring that Defendant has committed the violations of law alleged herein;

D.  Providing for any and all injunctive relief the Court deems appropriate;

E.  Awarding statutory damages in the maximum amount for which the law provides;

F.  Awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

G.  Providing for any and all equitable monetary relief the Court deems appropriate;

H.  Awarding damages in accordance with proof and in an amount consistent with applicable precedent;

I.  Awarding Plaintiff the reasonable costs and expenses of suit, including attorneys'

fees;

J.   Awarding pre- and post-judgment interest to the extent the law allows; and

K.   For such further relief as this Court may deem just and proper.


Dated:   August 26, 2020                    */s/ Spencer Sheehan*
                                            SHEEHAN & ASSOCIATES, P.C.
                                            Spencer Sheehan
                                            60 Cuttermill Rd Ste 409
                                            Great Neck NY 11021-5101
                                            Telephone: (516) 303-0552
                                            Facsimile: (516) 234-7800
                                            *spencer@spencersheehan.com*

                                            JAMES CHUNG, ESQ.
                                            43-22 216th Street
                                            Bayside, NY 11361
                                            Telephone: (718) 461-8808
                                            Facsimile: (929) 381-1019
                                            *jchung_77@msn.com*

                                            *Attorneys for Plaintiff*

1:20-cv-03983
United States District Court
Eastern District of New York

David Chung, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Pure Fishing, Inc.,

Defendant

## Complaint

```
Sheehan & Associates, P.C.
  60 Cuttermill Rd Ste 409
  Great Neck NY 11021-3104
     Tel: (516) 303-0552
     Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  August 26, 2020

/s/ Spencer Sheehan
Spencer Sheehan